FILED

2015 Mar-31  PM 05:16
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **SONYA MARSHALL,** | } | |
| | } | |
| **Plaintiff,** | } | |
| | } | |
| **v.** | } | **Case No.: 2:12-cv-03914-MHH** |
| | } | |
| **BRAVO FOOD SERVICE, LLC,** | } | |
| **d/b/a LITTLE CAESARS** | } | |
| | } | |
| **Defendant.** | } | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Plaintiff Sonya Marshall is a former employee of defendant Bravo Food Service, LLC, d/b/a Little Caesars. Ms. Marshall last worked for Bravo as an assistant manager at the company's Center Point/Huffman location. In November 2011, Bravo terminated Ms. Marshall's employment. According to Bravo, Ms. Marhsall misappropriated company property by receiving a gift card that another store employee traded for pizzas and by failing to report the incident to management.

Ms. Marshall attributes Bravo's employment decision to discriminatory conduct. She claims that Bravo subjected her to a sexually hostile work

environment and retaliated against her in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e et seq.

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, Bravo asks the Court to enter judgment as a matter of law in its favor on all of Ms. Marshall's claims.  (Doc. 17).  Having reviewed the record, and with the benefit of oral argument,[1] the Court finds that genuine issues of fact exist regarding Bravo's actual or constructive notice of the harassing behavior.  Therefore, Ms. Marshall's hostile work environment claim will proceed to trial. Ms. Marshall's retaliation claims fail because she did not engage in statutorily protected conduct.

## I.      Relevant Undisputed Facts and Procedural Background[2]

### A.      Ms. Marshall's Employment with Bravo

Bravo operates a number of Little Caesars restaurants in the Birmingham, Alabama area.  (Doc. 18-1, ¶ 2).  Bravo hired Ms. Marshall on October 12, 2009 to work as an hourly associate (or crew member) in its Center Point/Huffman restaurant.  (Doc. 18-1, ¶ 5; Doc. 26-1, p. 9).  For a couple of months in 2010, Ms. Marshall split time between the Center Point/Huffman restaurant and the Eastlake restaurant.  (Doc. 26-1, p. 12).  At some point, Bravo promoted Ms. Marshall to an

---

[1] The Court held a hearing on Bravo's motion on September 10, 2014.  A court reporter was present, and a transcript is available upon request.

[2] Consistent with the summary judgment standard, the Court presents the facts in the light most favorable to Ms. Marshall.

hourly assistant manager position.  (Doc. 26-1, p. 9).  Ms. Marshall remained in the assistant manager position until Bravo fired her.  (Doc. 26-1, p. 9).

### B.     Bravo's Management Structure

Ramon Arias is Bravo's president.  His son, Matthew Arias, is Bravo's Vice President.  (Doc. 18-1, ¶ 7).

Bravo generally assigns fewer than six employees to work each shift in its Little Caesars stores.  (Doc. 18-1, ¶ 7).  General managers oversee the operations of their stores and provide day-to-day supervision of employees.  Hourly assistant managers serve as shift leaders and act as the manager on duty when the general manager is not in the store.  (Doc. 18-1, ¶ 7).

General managers do not have the authority to formally discipline assistant managers; to change employees' pay; or to hire, fire, promote, or demote employees.  (Doc. 18-1, ¶ 7).  Ramon and Matthew Arias make the decisions to hire, fire, and promote Bravo employees.  (Doc. 18-1, p. 4, ¶ 7).  Bravo's Pre-Employment Training Handbook states that "[o]nly Ramon Arias can terminate your employment" at Bravo.  (Doc. 18-1, p. 9, ¶ 25).

### C.     Bravo's Anti-Harassment Policy

Bravo's Pre-Employment Training Handbook contains an anti-harassment policy.  The policy provides:

> Bravo Food Service will not TOLERATE any form of sexual
> harassment.    Sexual    harassment    behavior    includes    sexual

> conversations, jokes, comments, inappropriate hand or body signs, touching . . . and activity that makes a crew member or any other individual feel uncomfortable.   .   .   .   Any incident of sexual harassment must be reported immediately to Ramon S. Arias @ (205) 587-1841.

(Doc. 18-1, p. 8, ¶ 2) (emphasis in policy).  The policy also states that employees should "immediately report to [their] Manager or Ramon Arias . . . [a]ny instance of [h]arassment or inappropriate conduct."  (Doc. 18-1, p. 8, ¶ 11).  The handbook directs employees to a one page note on sexual harassment defining the term and instructing employees to "use any employer complaint mechanism or grievance system available."  (Doc. 18-1, p. 9).

When Ms. Marshall started working for Bravo, she remembers signing an acknowledgement form confirming that she read Bravo's Pre-Employment Training Handbook and understood the rules and regulations contained in the handbook.   (Doc. 18-1, p. 7; Doc. 26-1, p. 10).   Bravo cannot locate the acknowledgment form that Ms. Marshall signed.  Ms. Marshall testified that she does not remember reading or signing Bravo's sexual harassment policy.  (Doc. 26-1, p. 10).

### D.    Harassing Conduct

In the summer of 2010, while Ms. Marshall was working shifts at both the Center Point and Eastlake Little Caesars stores, Ms. Marshall met Anna Taylor at the Eastlake location.  (Doc. 26-1, p. 14).  At the time, both Ms. Marshall and Ms.

Taylor were assistant managers.  (Doc. 26-1, p. 14).  While both women were working in the Eastlake store, Ms. Taylor made comments to Ms. Marshall about her appearance.  For example, Ms. Taylor said that Ms. Marshall "look[ed] nice" and that her "hair look[ed] pretty."  (Doc. 26-1, p. 14).  Ms. Marshall did not view Ms. Taylor's 2010 comments as harassment.  (Doc. 26-1, p. 14).   According to Ms. Marshall, Ms. Taylor did not start harassing her until 2011 when the two women worked together at the Center Point/Huffman restaurant.  (Doc. 26-1, p. 15).

In 2011, Bravo placed Ms. Taylor in the Center Point/Huffman restaurant as a general manager.  (Doc. 26-1, p. 15).  By that time, Ms. Marshall was no longer rotating between the Eastlake and the Center Point stores; she worked only at the Center Point location.  When she began working as the general manager of the Center Point store, Ms. Taylor's behavior changed.  According to Ms. Marshall, "[t]here was a big difference.  The harassment was really graphic."  (Doc. 26-1, p. 14).  For example, Ms. Taylor "would walk around like she was wearing or had a penis" and would "rub[] her body against [Ms. Marshall's]."  (Doc. 26-1, p. 15).  Ms. Taylor once asked Ms. Marshall "do you feel this" and said "let me just stick the head in."  (Doc. 26-1, p. 15).  Ms. Taylor "smacked" Ms. Marshall on her buttocks twice.  Taylor once commented:  "'gol, you got a big ass; when can I get some of that[?]"  (*Id.*).  Ms. Marshall testified that Ms. Taylor made these

comments or comments like them every day that Ms. Marshall worked with Ms. Taylor.  (*Id.* at p. 17).  Leroy Davis, an hourly associate, and Aimee Peterson, an hourly assistant manager, overheard some of Ms. Taylor's comments and witnessed her behavior.  (Doc. 26-1, pp. 15-16).  Martez McCoy, another hourly associate, also observed Ms. Taylor's conduct.  (Doc. 26-1, p. 28).

Ms. Marshall did not complain about Ms. Taylor's harassment to Ramon Arias.  (Doc. 18-1, ¶ 9; Doc. 26-1, p 22).  Ms. Marshall did not complain personally about Ms. Taylor's harassment to Matthew Arias, or her zone manager, Frezell Warren.  (Doc. 26-1, pp. 18, 20).  Ms. Marshall complained about Ms. Taylor's behavior only to Ms. Peterson, who was Ms. Marshall's equivalent in the Bravo management hierarchy.  (Doc. 26-1, p. 18).  Ms. Marshall told Ms. Peterson that Ms. Taylor's harassment "was getting so bad" that Ms. Marshall "was going to say something to somebody."  (Doc. 26-1, p. 18).  Ms. Marshall told Ms. Peterson that she (Ms. Marshall) "was going to call Matthew [Arias] and talk to him about it." (Doc. 26-1, p. 18).   According to Ms. Marshall, Ms. Peterson told Mr. Warren that Ms. Marshall planned to call Matthew Arias.  (Doc. 26-1, p. 18).

After Ms. Marshall complained to Ms. Peterson, Mr. Warren changed Ms. Marshall's schedule and required her to work on Sundays.  (Doc. 26-1, p. 19).  Mr. Warren also required Ms. Marshall to make the schedule and clean the back of the store, the walls, and the pizza racks.  (Doc. 26-1, p. 20).  Mr. Warren stopped

communicating with Ms. Marshall about day-to-day operations.  (Doc. 26-1, p. 20).

### E.    Ms. Marshall's Termination

On November 11, 2011, Ms. Taylor arranged to trade pizzas with an Applebee's employee in exchange for Applebee's gift cards.  (Doc. 18-5, ¶ 5; Doc. 26-1, pp. 21-22).  Early in the day, Ms. Marshall answered a phone call from someone at Applebee's who asked if the pizzas were ready.  (Doc. 26-1, p. 21).  Ms. Marshall did not see a call-in order, so she asked Ms. Taylor about the call.  (Doc. 26-1, p. 22).  Ms. Taylor took the phone from Ms. Marshall.  When Ms. Taylor hung up, she told the other crew members to prepare two cheese pizzas, two pepperoni pizzas, and two sausage pizzas.  (Doc. 26-1, p. 22).

Ms. Taylor then asked Ms. Marshall and the other crew members if they wanted anything to eat from Applebee's.  (Doc. 26-1, p. 22).  Ms. Marshall and Martez McCoy replied that they would like chicken quesadillas.  Ms. Peterson did not want food.  About an hour later, Mr. McCoy asked Ms. Marshall about the food from Applebee's.  Ms. Marshall, in turn, asked Ms. Taylor about the food.  Ms. Taylor responded that she thought Applebee's was bringing food but instead left gift cards.  (Doc. 26-1, pp. 21-22).  Ms. Taylor gave Ms. Marshall one of the gift cards.  The cards were business cards that stated: "Good for $25 worth of food.  No alcohol.  No gratuity."  (Doc. 26-1, pp. 21-22).  Ms. Taylor told Ms. Marshall

not to tell anyone what happened, but Ms. Marshall immediately told Mr. McCoy. (Doc. 26-1, pp. 22, 28).  Mr. McCoy did not respond to Ms. Marshall, but he reported the conduct to Matthew Arias.  (Doc. 26-1, pp. 22, 24).  Ms. Peterson also knew about the gift card.  (*Id.*).  There is a videotape that captures Ms. Taylor giving the card to Ms. Marshall.  (Doc. 26-1, p. 24).

About a week later, Ms. Marshall discussed the incident with Ms. Peterson. Ms. Marshall told Ms. Peterson that Ms. Taylor changed the waste log on November 11, 2011 to account for the pizzas Ms. Taylor gave away.  After that conversation, Ms. Marshall returned the gift card to Ms. Taylor because Ms. Marshall did not want to owe Ms. Taylor anything.  (Doc. 26-1, pp. 22-23).  Ms. Marshall did not tell Mr. Warren, Ramon Arias, or Matthew Arias about the gift card incident.  (Doc. 26-1, pp. 22-23, 27).  Ms. Marshall explained that she never communicated with Ramon Arias; she spoke only to Matthew Arias, and she told him "everything" that happened in the store.  Ms. Marshall stated that she would have told Matthew about the gift card had he come to the store for a visit, but he had not been in the store "for a while."  She did not talk to Mr. Warren about the gift card because he would have told Ms. Taylor about the conversation. According to Ms. Marshall, Mr. Warren and Ms. Taylor were close friends, so close, in fact, that Mr. Warren had a key to Ms. Taylor's apartment.  (*Id.* at pp. 22, 26-27).

On November 28, 2011, more than two weeks after Ms. Taylor traded pizza for Applebee's gift cards, Mr. Warren met with Ms. Marshall to discuss the gift card incident.  (Doc. 18-3, ¶ 8; Doc. 26-1, pp. 23-24).  Ms. Marshall provided a statement as part of Bravo's investigation.  She admitted that Ms. Taylor traded pizzas for two $25.00 gift cards redeemable for food at Applebee's.  (Doc. 18-3, ¶ 8).  Ms. Marshall also admitted that Ms. Taylor gave her one of the gift cards.  (Doc. 18-3, ¶ 8).    Mr. Warren reported his findings to Matthew Arias, who discussed  the  matter  with  Ramon  Arias.  (Doc. 18-3, ¶ 9; Doc. 18-4, ¶ 7).  Matthew and Ramon Arias decided to terminate Ms. Marshall's employment and Ms. Taylor's employment with the company.  (Doc. 18-4, ¶ 7).

Matthew Arias met Ms. Marshall in the parking lot at work on November 29,  2011  to  explain  that  Bravo  terminated  her  employment  because  she participated "in the misappropriation of company property by receiving the gift card which had been traded for pizzas and because she failed to report that the misappropriation  occurred."  (Doc. 18-4, ¶ 9).  According to Ms. Marshall, Matthew Arias told her the company had to fire her because she knew that Ms. Taylor was stealing and did not tell management.  (Doc. 26-1, p. 26).

On November 28, 2011, one day before Bravo terminated Ms. Marshall's employment, Ms. Peterson told Ms. Marshall that Ms. Peterson "told [Mr. Warren]

everything . . . Everything that was happening about the harassment [and] about [Ms. Taylor] giving [Ms. Marshall] that card. . . ." (Doc. 26-1, pp. 18, 21).

### F.   Procedural Background

Following her termination, Ms. Marshall filed a Charge of Discrimination with the Equal Employment Opportunity Commission.  (Doc. 1-1, p. 1).  After investigating Ms. Marshall's charge, the EEOC issued a Dismissal and Notice of Right to Sue on September 6, 2012.  (Doc. 1-1, p. 2).  Ms. Marshall filed a complaint in federal court on November 19, 2012.  (Doc. 1).  After the parties engaged in discovery, Bravo filed a motion for summary judgment.  (Doc. 16). The parties fully briefed the motion.  (Docs. 17, 20, 24).  After the summary judgment briefing, Bravo filed a motion to strike certain exhibits that Ms. Marshall submitted in opposition to Bravo's motion for summary judgment. (Doc. 23).  The parties submitted briefs concerning Bravo's motion to strike.  (Docs. 27, 28).  On this record, the Court considers Bravo's motions to strike and motion for summary judgment.

## II.   Analysis

### A.   Bravo's Motion to Strike

Bravo asks the Court to strike Ms. Marshall's unsworn handwritten statement (Doc. 20-1, pp. 3-4) and Shannon Buell's affidavit (Doc. 20-1, pp. 5-6), both of which Ms. Marshall relied upon in her response to Bravo's motion for

summary judgment.  (Doc. 23).  Under Rule 56(c)(2) of the Federal Rules of Civil Procedure, at the summary judgment stage, "[a] party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence."  Fed. R. Civ. P. 56(c)(2).  These objections function like trial objections adjusted for the pretrial setting, and "[t]he burden is on the proponent to show that the material is admissible as presented or to explain the admissible form that is anticipated."  Fed. R. Civ. P. 56(c)(2) advisory committee's note (2010 amendments).

Rule 56(c)(2) enables a party to submit evidence that ultimately will be admissible at trial in an inadmissible form at the summary judgment stage.  For example, under the rule, "a district court may consider a hearsay statement in passing on a motion for summary judgment if the statement could be reduced to admissible evidence at trial or reduced to admissible form."  *Jones v. UPS Ground Freight*, 683 F.3d 1283, 1293–94 (11th Cir. 2012) (internal quotation marks omitted).  A district court has broad discretion to determine at the summary judgment stage what evidence it will consider pursuant to Rule 56(c)(2).  *See Green v. City of Northport*, 2014 WL 1338106, at *1 (N.D. Ala. March 31, 2014).

Ms. Marshall refers to her unsworn, handwritten statement to demonstrate that Bravo was aware of Ms. Taylor's alleged sexual harassment.  (*See* Doc. 20, p. 6, ¶ 7).  According to Ms. Marshall's statement, Mr. Davis told Ms. Marshall that

Mr. Davis told Matthew Arias that he (Mr. Davis) told Mr. Warren about the harassment.   Ms. Marshall's statement also indicates, consistent with Ms. Marshall's deposition testimony, that Ms. Peterson told Ms. Marshall that Ms. Peterson told Mr. Warren "everything that happened leading up to [Ms. Marshall] being given the gift card."  (Doc. 20-1, p. 3).   The portions of the statement upon which Ms. Marshall appears to rely contain information that Mr. Davis or Ms. Peterson, two co-workers, told Ms. Marshall.   Therefore, the statement, in its current form, constitutes inadmissible hearsay because Ms. Marshall offers the statement to prove the truth of the matter asserted.  *See* Fed. R. Evid. 801(c)(1)-(2) (defining hearsay as "a statement that the declarant does not make while testifying at the current trial or hearing; and a party offers in evidence to prove the truth of the matter asserted in the statement.").   However, Ms. Marshall may call Mr. Davis and Ms. Peterson as witnesses at trial.  If she does, Ms. Marshall may be able to avoid a hearsay objection to testimony from these witnesses.

The same analysis applies to the evidence contained in Ms. Buell's affidavit. In its current form, the substantive testimony contained in the affidavit is inadmissible hearsay.   According to Ms. Buell, Ms. Bright said that she (Ms. Bright) told Mr. Warren "months before [Ms. Marshal] was fired that Anna Taylor had been continuously sexually harassing [Ms. Marshall] and that action should be taken against Anna Taylor to stop the harassment."  (Doc. 20-1, p. 6).   Ms. Buell's

12

testimony is based entirely on what Ms. Bright told Ms. Buell. (*See* Doc. 20-1, pp. 5-6, ¶ 4). Because Ms. Marshall may have the opportunity to call Ms. Bright as a trial witness, and Ms. Marshall may elicit testimony that may enable her to avoid a hearsay objection, Ms. Marshall may reduce the statements contained in Ms. Buell's affidavit to an admissible form for trial.

The issue is largely moot at the summary judgment stage, though, because the Court finds that there are triable disputed issues of fact without resorting to either Ms. Marshall's unsworn handwritten statement or Ms. Buell's affidavit. Accordingly, the Court **DENIES** Bravo's motion to strike. (Doc. 23).

### B.   Bravo's Motion for Summary Judgment

#### 1.   Standard of Review

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To demonstrate that there is a genuine dispute as to a material fact that precludes summary judgment, a party opposing a motion for summary judgment must cite "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A). When considering a summary judgment motion, the Court must view

the evidence in the record in the light most favorable to the non-moving party.  *Hill v. Wal-Mart Stores, Inc.*, 510 Fed. Appx. 810, 813 (11th Cir. 2013).  "The court need consider only the cited materials, but it may consider other materials in the record."  Fed. R. Civ. P. 56(c)(3).

## 2.   Ms. Marshall's Sexual Harassment Claims

To establish a prima facie case for sexual harassment against Bravo under Title VII, Ms. Marshall must demonstrate (1) that she belongs to a protected group; (2) that she was subject to unwelcome sexual harassment, such as sexual advances, requests for sexual favors, or other conduct of a sexual nature; (3) that the harassment was based on her gender; (4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of her employment and create a discriminatorily abusive working environment; and (5) that a basis exists for holding Bravo liable.  *Guthrie v. Waffle House, Inc.*, 460 Fed. Appx. 803, 806 (11th Cir. 2012) (internal quotations omitted).

There are two ways in which sexual harassment may alter the terms and conditions of employment such that an employer may be held liable for an employee's sexual harassment of a co-employee.  The first involves a tangible employment action.  The second concerns a hostile work environment.  Ms. Marshall asserts claims under both theories.

a.  Tangible Employment Action

Ms. Marshall's tangible employment claim is not viable.   A tangible

employment action occurs when:

> the employee's refusal to submit to a supervisor's sexual demands
> results in a tangible employment action being taken against her . . . An
> employer is liable under Title VII if it (even unknowingly) permits a
> supervisor to take a tangible employment action against an employee
> because she refused to give in to his sexual overtures. That liability
> exists regardless of whether the employee took advantage of any
> employer-provided system for reporting harassment.

*Hulsey v. Pride Restaurants*, LLC, 367 F.3d 1238, 1245 (11th Cir. 2004).  Ms.

Marshall's tangible action theory fails for two reasons.

First, the harasser, Ms. Taylor, does not qualify as a supervisor under *Vance*

*v. Ball State Univ.*, 133 S. Ct. 2434 (2013).  In *Vance,* the Supreme Court held that

a supervisor is one whom "the employer has empowered . . . to take tangible

employment action against the victim, *i.e.*, to effect a significant change in

employment status, such as hiring, firing, failing to promote, reassignment with

significantly different responsibilities, or a decision causing a significant change in

benefits."  *Id.* at 2443 (citation and internal quotation marks omitted).  The record

contains no evidence that indicates that Ms. Taylor had the power to hire, fire,

promote, or reassign Bravo employees.  The record states that this authority rested

with Ramon Arias and Matthew Arias.  (Doc. 18-1, p. 4, ¶ 7; Doc. 18-1, p. 9, ¶ 25).

Although Ms. Taylor had no power to take formal employment actions, general managers, like Ms. Taylor, manage operations at their respective stores and provide day-to-day supervision of employees. (Doc. 18-1, ¶ 7). The Court recognizes that in some circumstances, an employer may call upon an employee with that type of authority to provide substantial input into employment decisions, and "the employer may be held to have effectively delegated the power to take tangible employment actions to the employees on whose recommendations it relies." *Vance*, 133 S. Ct. at 2452 (internal citation omitted). But those are not the facts here. The record contains no evidence that Bravo sought input from Ms. Taylor or other general managers regarding employment decisions. Rather, the undisputed evidence demonstrates that Ramon Arias or Matthew Arias made all personnel decisions with input from the human resources department and the appropriate zone manager. (Doc. 18-1, p. ¶ 7). Ms. Marshall's responsive brief does not address Bravo's undisputed evidence on this point, and the Court, upon review of the full summary judgment record, finds no testimony that creates a genuine issue of fact regarding Ms. Taylor's role with respect to employment decisions.

Second, assuming for the sake of argument that Ms. Taylor was Ms. Marshall's supervisor, Ms. Marshall has not demonstrated that Ms. Taylor took a tangible employment action against Ms. Marshall for her failure to give in to Ms.

Taylor's sexual advances.   Although Ms. Marshall's response in opposition to summary judgment contains a string citation to a number of cases recognizing the tangible action theory (*see* Doc. 20, pp. 11-12), Mr. Marshall has neither alleged facts nor presented evidence that suggests that Ms. Taylor or any other Bravo supervisor terminated Ms. Marshall's employment or took some other adverse employment action because Ms. Marshall did not submit to Ms. Taylor's sexual demands.   Therefore, the tangible action theory is inapplicable in this case, and Ms. Marshall may prevail on her sexual harassment claim against Bravo only if she can establish a hostile work environment claim.

    b.   <u>Hostile Work Environment</u>

The standard for a hostile work environment claim is this:

The second way for sexual harassment to violate Title VII is if it is sufficiently severe and pervasive to effectively result in a change (sometimes referred to as a constructive change) in the terms and conditions of employment, even though the employee is not discharged, demoted, or reassigned. This is hostile work environment harassment. *See id.* at 754, 118 S.Ct. at 2265. The supervisor does not have to be the harasser for this kind of sexual harassment to occur, although experience has proven that he often will be.

*Hulsey*, 367 F.3d at 1245.[3]   Bravo does not contest that Ms. Taylor subjected Ms. Marshall to severe or pervasive harassment.   (Doc. 11, p. 17).   Instead, Bravo contends that it is not liable for Ms. Taylor's harassment.

"Liability for hostile work environment differs depending on whether the harassment was perpetrated by a co-worker or a supervisor." *Terell v. Paulding Cnty.*, 539 Fed. Appx. 929, 932 (11th Cir. 2013) (internal citations omitted). Because the harassing conduct that Ms. Marshall describes came from her co-worker, Ms. Taylor (a co-worker who could not take a tangible employment action against Ms. Marshall), Bravo may be held liable for Ms. Taylor's conduct only if the company "was negligent with respect to the offensive behavior." *Vance*, 133

---

[3] In *Reeves v. C.H. Robinson Worldwide, Inc.*, 594 F.3d 798 (11th Cir. 2010) (*en banc*), the Eleventh Circuit Court of Appeals "reiterate[ed] several core principles of employment discrimination law." *Id.* at 807.  The Court wrote:

> first, to prove a hostile work environment under 42 U.S.C. § 2000e–2(a)(1), a plaintiff must show that her employer discriminated because of her membership in a protected group, and that the offensive conduct was either severe or pervasive enough to alter the terms or conditions of employment; second, Title VII is not a civility code, and not all profane or sexual language or conduct will constitute discrimination in the terms and conditions of employment; third, workplace conduct cannot be viewed in isolation, but rather is to be viewed cumulatively, and in its social context; and fourth, a plaintiff can prove a hostile work environment by showing severe or pervasive discrimination directed against her protected group, even if she herself is not individually singled out in the offensive conduct.

*Id.*  The Eleventh Circuit clarified that a Title VII plaintiff does not have to prove that harassing conduct was severe *and* pervasive.  Instead, "[e]ither severity or pervasiveness is sufficient to establish a violation of Title VII."  *Id.* at 808.  "Evidence of harassment is considered both cumulatively and in the totality of the circumstances."  *Id.*

S. Ct. at 2441.  Ms. Marshall has the burden of proving that Publix was negligent. *Id.* at 2450.[4]

To establish that Bravo was negligent, Ms. Marshall "'must show that [Bravo] either knew (actual notice) or should have known (constructive notice) of the harassment and failed to take immediate and appropriate corrective action.'" *Hill*, 510 Fed. Appx. at 814 (quoting *Watson v. Blue Circle, Inc.*, 324 F.3d 1252, 1259 (11th Cir. 2003)).  "Actual notice is established by proof that management knew of the harassment."  *Watson*, 324 F.3d at 1259.  "When an employer has a clear and published policy that outlines the procedures an employee must follow to report suspected harassment and the complaining employee follows those procedures, actual notice is established."  *Id.*  When an employer's harassment policy enumerates specific members of management to whom employees must report harassment, an employer does not have actual notice of an employee's harassment if the employee reports the harassment to members of management not

---

[4]  The standard would be different if the harasser were a supervisor, i.e. an employee who Bravo empowered "to take tangible employment actions" against Ms. Marshall.  If Ms. Taylor qualified as a supervisor under *Vance*, then Bravo could be held vicariously liable for her conduct "even in the absence of negligence."  *Vance*, 133 S. Ct at 2441, 2443.  When a supervisor's conduct is at issue, if the supervisor's harassment "does not culminate in a tangible employment action, the employer can be vicariously liable for the supervisor's creation of a hostile work environment if the employer is unable to establish an [*Ellerth/Faragher*] affirmative defense."  *Id.* at 2442 (citing *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998); *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742 (1998)).  "Specifically, an employer can mitigate or avoid liability by showing (1) that it exercised reasonable care to prevent and promptly correct any harassing behavior and (2) that the plaintiff unreasonably failed to take advantage of any preventive or corrective opportunities that were provided."  *Id.*

specified in the policy.  *See Madray v. Publix Supermkts., Inc.*, 208 F.3d 1290, 1300 (11th Cir. 2000); *Breda v. Wolf Camera & Video*, 222 F.3d 886, 889–90 (11th Cir. 2000).

Bravo's Pre-Employment Training Handbook states:  "Any incident of sexual harassment must be reported immediately to Ramon S. Arias @ (205) 587-1841."  (Doc. 18-1, p. 8, ¶ 2).  The handbook also states that employees should "immediately report to [their] Manager or Ramon Arias . . . [a]ny instance of [h]arassment or inappropriate conduct."  (Doc. 18-1, p. 8, ¶ 11).  It is undisputed that Ms. Marshall did not report Ms. Taylor's behavior to Mr. Ramon Arias.  Ramon Arias testified that he did not witness Ms. Taylor harass Ms. Marshall and that he did not receive complaints from Ms. Marshall or another Bravo employee about the harassment.  (Doc. 18-1, p. 4, ¶ 9).

But Ms. Taylor also had the option under the Bravo handbook of reporting Ms. Taylor's conduct to her "Manager."  (Doc. 18-1, p. 8, ¶ 11).  The term "Manager" is not clear, particularly in light of Bravo's management structure.  One reasonable reading of the term "Manager" is that "Manager" means the manager above the individual who is being harassed.  In Bravo's chain of command, the manager over an assistant store manager like Ms. Marshall would be the general store manager.  Ms. Marshall's general store manager was Ms. Taylor, Ms. Marshall's harasser.  Although the record does not indicate that Ms. Marshall

formally complained to Ms. Taylor about Ms. Taylor's inappropriate conduct, such a complaint would have been futile because Ms. Taylor was aware of her own behavior.  In addition, Wendy Bright, the Eastlake General Manager, overheard comments that Ms. Taylor made to Ms. Marshall at the Eastlake store when Ms. Marshall and Ms. Taylor were assistant managers at that store.  Ms. Bright asked Ms. Marshall, "how do you put up with [Ms. Taylor] talking to you like that." (Doc. 26-1, p. 15).  Viewing the ambiguous term "Manager" in the light most favorable to Ms. Marshall, a question of fact exists concerning whether Bravo management knew of Ms. Taylor's behavior because two general "Manager[s]" were aware of Ms. Taylor's harassing conduct.

Moreover, there are disputed questions of fact relating to constructive notice, some of which have to do with the ambiguity in Bravo's harassment policy. "Constructive notice . . . is established when the harassment was so severe and pervasive that management reasonably should have known of it."  *Watson*, 324 F.3d at 1259 (citing *Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1278 (11th Cir. 2002)).  To preclude a finding of constructive notice, an employer must have a valid harassment policy that is well-disseminated and effective.  *Watson*, 324 F.3d at 1260 (citing *Farley v. Am. Cast Iron Pipe Co.*, 115 F.3d 1548, 1553 (11th Cir. 2002)).  "'Where there is no policy, *or where there is an ineffective or incomplete policy,* the employer remains liable for conduct that is so severe and pervasive as to

confer constructive knowledge." *Watson*, 324 F.3d at 1260 (quoting *Farley*, 115 F.3d at 1554) (emphasis in *Watson*).   A company's harassment policy "must be found ineffective when company practice indicates a tolerance toward harassment or discrimination." *Miller*, 277 F.3d at 1280.   A company's policy also may be ineffective when the policy does not provide "multiple avenues of lodging a complaint to assessable, designated representatives." *Madray*, 208 F.3d at 1299.

Here, "genuine issues of material fact exist that preclude th[is] district court from finding that [Bravo] has an effective sexual harassment policy." *Watson*, 324 F.3d at 1260.   First, although Ms. Marshall testified that she signed Bravo's pre-employment handbook containing the policy, she also testified that she does not remember "signing anything on sexual harassment." (Doc. 26-1, p. 10).   And, Ms. Marshall's acknowledgment form is not located in the record.[5]   This evidence suggests that  Bravo's policy was not "aggressively and thoroughly disseminated" *See Miller*, 277 F.3d at 1279; *see also Frederick v. Sprint/United Mgmt. Co.*, 246 F.3d 1305, 1315 (11th Cir. 2001) (plaintiff's testimony that she never received the company's policy created issue of fact regarding whether the policy was effectively published.).

---

[5] Bravo submitted "an example of the [new employee] packet" used at the time Ms. Marshall was employed. (*See* Doc. 18-1, p. 3, ¶ 5; Doc. 18-1, pp. 7-9).  Ms. Taylor's signature appears on these new employee acknowledgment forms.  (Doc. 18-1, pp. 7-9).  Bravo cannot locate the forms that Ms. Marshall signed.  (September 10, 2014 hearing transcript, p. 5).

Second, questions of fact exist regarding whether Bravo "vigorously enforced" the policy and whether the policy provides adequate "alternate avenues of redress." *Farley*, 115 F.3d at 1554. As stated, Bravo's policy instructs employees to report sexual harassment to Ramon Arias, the president of Bravo. (Doc. 18-1, p. 8, ¶ 2). A reasonable juror may conclude that requiring employees to report sexual harassment to the president of the company intimidates employees to the point that the policy deters employees from making reports of harassment and fails to offer employees "multiple avenues of lodging a complaint to assessable, designated representatives." *Madray*, 208 F.3d at 129

Additionally, a reasonable juror may conclude that the alternative reporting option for "any incidence of harassment or inappropriate conduct" is confusing and ineffective because the policy requires employees to report harassing conduct to a "Manager or Ramon Arias," and nearly every Bravo employee either has management responsibilities or is called a manager of some sort. Below Ramon and Matthew Arias are zone managers, like Mr. Warren. Below zone managers are individual store managers, called general managers. Below general managers are assistant managers, like Ms. Marshall. Assistant managers are hourly shift leaders but they have a management title. (Doc. 18-1, ¶ 7; September 14, 2010 hearing transcript, p. 20). Hourly assistant managers "serve as the general manager when the general manager is not present in the store." (Doc. 18-1, ¶ 7). Reasonable

jurors may infer that because nearly every employee has "manager" in his or her title, Bravo does not effectively put its employees on notice of the proper "Manager" to whom they should complain about harassment.

Beyond questions concerning the effectiveness of Bravo's sexual harassment policy lies the practical fact that Bravo is not a large company. Company vice president Matthew Arias and Zone Manager Frezell Warren typically visited Ms. Marshall's restaurant at least once every week other week. (Doc. 18-3, ¶ 4; Doc. 18-4, ¶ 3). Ms. Taylor's harassing behavior, which for purposes of summary judgment Bravo does not contest was severe or pervasive, occurred in the Center Point/Huffman restaurant on a daily basis from August 2011 until the end of November 2011. (Doc. 26-1, p. 17). Ms. Marshall is prepared to present evidence that other store employees were well-aware of Ms. Taylor's conduct, and Ms. Taylor and Mr. Warren were very close friends. This evidence creates triable issues of fact regarding Bravo's constructive knowledge of the harassment and the company's tolerance of harassment. *See Miller*, 277 F. 3d at 1278-79. And, "where there is evidence from which a jury could reasonably infer that Bravo *did* know of the harassment," Bravo's policy, "no matter how well-designed [] will not absolve [Bravo] of liability under Title VII." *Farley*, 115 F.3d at 1548 (emphasis in original).

Because questions of fact exist regarding whether Bravo knew or should have known about Ms. Taylor's harassment, summary judgment is not appropriate on Ms. Marshall's hostile work environment claim.

### 3.    Ms. Marshall's Retaliation Claims

To establish a prima facie case for retaliation, a plaintiff must show that: (1) [s]he engaged in statutorily protected activity, (2) [s]he suffered a materially adverse action, and (3) there was a causal connection between the protected activity and the materially adverse action. *Howard v. Walgreen Co.*, 605 F.3d 1239, 1244 (11th Cir. 2010). If a plaintiff establishes a prima facie case, the employer must articulate a legitimate reason for the adverse employment action. *Davis v. Postmaster General*, 550 Fed. Appx. 777, 779 (11th Cir. 2013) (citing *Holifield v. Reno*, 115 F.3d 1555, 1567 (11th Cir. 1997)). If the employer meets this burden, then "the burden shifts back to the plaintiff to show that the proffered explanation is a pretext for retaliation." *Id.* Bravo argues that Ms. Marshall's retaliation claims fail because Ms. Marshall did not engage in protected activity. The Court agrees.[6]

"Under Title VII, an employee has engaged in protected activity if she has: (1) opposed an unlawful employment practice, or (2) made a charge, testified,

---

[6] Bravo also contends that Ms. Marshall cannot demonstrate that Bravo subjected her to an adverse action or that there was a causal connection between any purported activity and the adverse action. Because the Court finds that Ms. Marshall did not engage in protected activity, the Court does not reach these arguments.

assisted, or participated in any manner in an investigation, proceeding, or hearing under Title VII's retaliation provision." *Smith v. City of Fort Pierce, Fla.*, 565 Fed. Appx. 774, 777 (11th Cir. 2014) (internal quotations and citations omitted).  The record reflects that Ms. Marshall did not engage in either form of protected activity.

Ms. Marshall did not file an EEOC charge until after her termination.  (*See* Doc. 1-1, p. 1).  Therefore, Ms. Marshall may not recover under the participation clause.  *See E.E.O.C. v. Total Sys. Servs., Inc*., 221 F.3d 1171, 1174 (11th Cir. 2000) (participation clause "protects proceedings and activities which occur in conjunction with or after the filing of a formal charge with the EEOC").  The undisputed evidence also reflects that Ms. Marshall's conduct does not fall under the opposition clause.   Ms. Marshall did not personally complain about Ms. Taylor's alleged sexual harassment to anyone other than Ms. Peterson.[7]  Although questions of fact exist concerning the extent to which Bravo had notice of Ms. Taylor's conduct for purposes of Ms. Marshall's hostile work environment claim, Ms. Marshall has not offered sufficient evidence that she actively opposed any practice made unlawful by Title VII for purposes of a retaliation claim.[8]

---

[7] Even if Ms. Peterson told Mr. Warren about Ms. Marshall's complaints of sexual harassment, Ms. Peterson's report to Mr. Warren would constitute protected activity taken by Ms. Peterson, not Ms. Marshall.

[8] *See Murphy v. City of Aventura*, 383 Fed. Appx. 915, 918 (11th Cir. 2010) ("'A complaint about an employment practice constitutes protected opposition only if the individual explicitly or

Because Ms. Marshall cannot establish the first element of her prima facie case, Bravo is entitled to summary judgment on Ms. Marshall's Title VII retaliation claims.

## III.   Conclusion

For the reasons explained above, the Court **GRANTS IN PART** and **DENIES IN PART** Bravo's motion for summary judgment (Doc. 16) and **DENIES** Bravo's motion to strike (Doc. 23).   The Court enters judgment as a matter of law in favor of Bravo on Ms. Marshall's retaliation claims.   The Court DISMISSES WITH PREJUDICE Ms. Marshall's retaliation claims.    The Court **SETS** Ms. Marshall's hostile work environment claim for a jury trial at **9:00 a.m.** on **June 22, 2015**.   The Court will provide the parties additional instructions in a forthcoming pre-trial order.

**DONE** and **ORDERED** this March 31, 2015.

_Madeline H. Haikala_
**MADELINE HUGHES HAIKALA**
UNITED STATES DISTRICT JUDGE

---

implicitly communicates a belief that the practice constitutes unlawful employment discrimination.'") (quoting EEOC Compl. Man. (CCH) §§ 8-II-B(2) (2006)); *see also Demers v. Adams Homes of N.W. Fla., Inc.*, 321 Fed. Appx. 847, 852 (11th Cir. 2009) ("[T]o engage in protected activity, the employee must still, at the very least, communicate [his] belief that discrimination is occurring to the employer, and cannot rely on the employer to infer that discrimination has occurred.") (internal quotations and citation omitted); *Brown v. City of Opelika*, 211 Fed. Appx. 862, 863-64 (11th Cir. 2006) (per curiam) (plaintiff did not engage in protected activity because she did not use the word "race" when she complained to supervisors, and the plaintiff "never voiced a complaint that the City was engaged in an unlawful employment practice.").